UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ENTERGY NUCLEAR VERMONT YANKEE, LLC, and ENTERGY NUCLEAR OPERATIONS, INC.,<br><br>      Plaintiffs,<br><br>  v.<br><br>PETER SHUMLIN, in his official capacity as GOVERNOR OF THE STATE OF VERMONT; WILLIAM H. SORRELL, in his official capacity as ATTORNEY GENERAL OF THE STATE OF VERMONT; and JAMES VOLZ, JOHN BURKE and DAVID COEN, in their official capacities as MEMBERS of THE VERMONT PUBLIC SERVICE BOARD,<br><br>      Defendants. | C.A. No. 11-cv-99 (JGM) |

**MEMORANDUM OF LAW OF THE MASSACHUSETTS ATTORNEY GENERAL, AS AMICUS CURIAE, IN SUPPORT OF VERMONT'S OPPOSITION TO ENTERGY'S MOTION FOR PRELIMINARY INJUNCTION**

*Order Granting Motion for Leave to File (Docket No. 40)*
*Entered on May 26, 2011 (Docket No. 43)*

  Massachusetts Attorney General Martha Coakley submits this memorandum on behalf of the Commonwealth of Massachusetts, as amicus curiae, in support of Vermont's opposition to Entergy's motion for a preliminary injunction in the above-captioned case. Entergy asserts that it is likely to prevail on the merits, but bases that argument on an overly broad preemption analysis that should be rejected for the reasons set forth in Vermont's opposition. In addition, Entergy's arguments fail because they are divorced from the constitutional limits on the Supremacy Clause. This memorandum focuses on those constitutional underpinnings, which are essential for a proper preemption analysis.

1

**INTERESTS**

The Commonwealth has a significant interest in the manner in which a State may regulate power generating facilities within its borders, including nuclear power plants. Numerous electricity-generating plants are located in the Commonwealth, including one existing and operational nuclear facility in Plymouth, Massachusetts, the Pilgrim Nuclear Power Station. This facility, and any other nuclear power plants that may be proposed, constructed or operated in the Commonwealth in the future, inherently have, or would have, associated with them a host of far-ranging issues, including, for instance: the need for power generation, land use, environmental concerns, ratemaking, economic issues, safety and security concerns, and costs of construction, operation, transmission, short- and long-term waste disposal and management, spent nuclear fuel storage, and emergency response planning.

The Commonwealth currently has various laws that relate to such issues either in the context of nuclear power plants (*see e.g.,* M.G.L. c. 146, §2 (authorization to formulate and adopt rules for the construction, installation and inspection of boilers, power reactor vessels and piping used in atomic energy installations); M.G.L. c. 146, §§46, 50A-50C (requirements for nuclear power plant operators and engineers, including eligibility, fees, licensing, and minimum supervising and shift requirements); M.G.L. c. 164, §69J ¼ (requirements for applications to construct generating facilities)), or that would regulate nuclear power plants under broadly applicable laws (*see e.g., Entergy Nuclear Generation Co. v. Department of Environmental Protection,* 459 Mass. 319 (2011) (upholding state regulation of cooling water intake structures of a nuclear power plant under state clean waters act)). In particular, however, the Nuclear Power and Waste Disposal Voter Approval and Legislative Certification Act, M.G.L. c. 164 App., § 3-1, *et seq.*, prohibits construction and operation of a new nuclear power plant within the

Commonwealth unless certain preconditions have been met that are aimed at demonstrating that the proposed plant would be viable, economically, over its life-span, without unduly burdening consumers or ratepayers. M.G.L. c. 164 App., § 3-3. The Act prohibits construction and operation of a new nuclear power plant unless it is approved by a majority of voters in a state-wide general election, and a majority of the legislature certifies:

> (i) that there exists an operating, federally-licensed facility for the timely and economical permanent disposal of high-level radioactive wastes generated by the proposed nuclear power plant;
>
> (ii) that an adequate emergency preparedness plan for the proposed nuclear power plant has been developed, approved, and implemented by the Commonwealth;
>
> (iii) that effective emission standards applicable to the proposed nuclear power plant have been promulgated by the Commonwealth to protect the public against health and safety hazards of radioactive air pollutants traceable to nuclear power plants within the Commonwealth;
>
> (iv) that there exists a demonstrated, federally-approved technology or means for the timely and economical decommissioning, dismantling, and disposal of the proposed nuclear power plant; and
>
> (v) that the proposed nuclear power plant offers the optimal means of meeting energy needs from the combined standpoints of overall cost, reliability, safety, environmental impact, land-use planning, and avoiding potential social and economic dislocation.

M.G.L. c. 164 App., § 3-3. Thus, the Commonwealth has a vital interest in preserving its ability to enact, implement and enforce its own laws, to address the numerous concerns inherent in construction and operation of nuclear power plants within its border, now or in the future. The preemption questions presented in this proceeding, while specifically focused on Vermont laws, implicate the same type of constitutional analysis that may be applied if the Commonwealth's laws regulating nuclear power plants are subjected to a preemption challenge. The Commonwealth has a critical interest in preserving its ability to regulate nuclear power generation within its borders as it sees fit, within constitutional limits. The Commonwealth also

has a strong interest in the ability of its sister state to exercise its police powers effectively with respect to the Vermont Yankee Station, which is situated less than five miles from the Massachusetts border, on the Connecticut River, which flows through Massachusetts, and which supplies electricity to residents and businesses in the Commonwealth.

In addition, as the recent catastrophic events at the nuclear power plant in Fukushima, Japan, demonstrate all too well, even beyond radiological safety risks, nearby communities face significant risks of harm to the environment, natural resources, and economic interests. In the event of an incident involving the release of high-level radiological material from Vermont Yankee Nuclear Power Station, Massachusetts communities could face contamination of soil, water, and agriculture resources that would force displacement of residents and businesses, conceivably devastating state or local economies for years into the Commonwealth's future.

Further, because Vermont Yankee Nuclear Plant supplies energy to the New England power grid, the Commonwealth also has an interest in whether Vermont Yankee Nuclear Plant will continue to produce and supply energy to the grid after March 2012. To be clear, the Attorney General takes no position on whether Vermont Yankee should, or should not, be allowed to continue to operate after March 2012, and she does not address the specific provisions of Vermont law being challenged. Rather, the Commonwealth's interests on this front relates to its need to understand and plan for changes to the region's energy supply to the extent such changes will affect residents and businesses.

Attorney General Coakley is the chief law officer of the Commonwealth of Massachusetts. She is expressly authorized by Massachusetts state law to participate in this type of proceeding. *See* M.G.L. c. 12, §3 ("The attorney general shall appear for the commonwealth . . . in all suits and other civil proceedings in which the commonwealth is . . . interested . . . in all

the courts of the commonwealth . . . and in such suits and proceedings before any other tribunal"); *see also* M.G.L. c. 12, §11D (authorizing the Attorney General "to prevent or remedy damage to the environment caused by any person . . . by commencing or intervening in a proceeding before an appropriate agency, department, board, commission, division or authority, whether state or federal. . . ."). The Attorney General has an interest in protecting and furthering the vital interests of the Commonwealth and its citizens in the areas of energy and economic strength, stability, and sustainability, protection and preservation of the commonwealth's environment and natural resources, protection of public health, safety and welfare, and preservation of the Commonwealth's residuary and inviolable rights under the U.S. Constitution as a concurrent sovereign.

For all these reasons, the Commonwealth has significant interests in this proceeding.

## ARGUMENT

Entergy's argument that it is likely to prevail on the merits relies on an overly broad preemption analysis that lacks merit and should be rejected for the reasons set forth in Vermont's opposition. In addition, Entergy's arguments must be rejected because they fail to appreciate the constitutional limits on the Supremacy Clause. This memorandum focuses on those constitutional underpinnings, which, when properly considered, prevent a preemption analysis from becoming "a freewheeling judicial inquiry" into broad policy objectives (or speculations about motives), because "such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." *See Chamber of Commerce of the United States v. Whiting*, No. 09-115, 563 U.S. __, slip op. at 22 (May 26, 2011), (plurality opinion) (quotation and citations omitted). Rather, properly considered, the constitutional underpinnings of the Supremacy clause limit a preemption analysis to "whether the ordinary meanings of state and

federal law conflict." *See Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 1208 (2009) (Thomas, J., concurring) (quotation omitted).

## I.     Proper Preemption Analysis Must Honor the Constitutional Limitations on the Supremacy Clause.

The Supremacy Clause provides that: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ." U.S. Const., Art. VI, cl. 2. With this clause, the framers vested in Congress an "extraordinary power." *Gregory v. Ashcroft,* 501 U.S. 452, 460 (1991). This power, to preempt state law, is truly remarkable in light of the framers' aim of designing a federalist scheme in which the Federal government has tempered powers. Indeed, the Constitution creates a delicate balance of powers between the dual federal and state sovereigns. *See e.g., Gregory* at 457-58 ("[w]e beg[a]n with the axiom that, under our federal system, the States possess sovereignty *concurrent* with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Gregory* at 457 (quotation omitted) (emphasis added).

As the following discussion shows, the Supremacy Clause must be construed and applied, not in isolation, but in the context of, and with strict adherence to, the limitations that arise from the structure and text of the Constitution, to maintain the delicate balance the framers sought as between the *concurrent* sovereigns. Application of preemptive effect outside these bounds would be untoward and impermissible.

## A.     As Dual Sovereigns, States Retain Numerous and Indefinite Powers.

"As every schoolchild learns, our Constitution establishes a system of *dual sovereignty* between the States and the Federal Government." *Gregory* at 457 (emphasis added). Under this constitutional system of *dual* or *concurrent* sovereigns, the framers intentionally created "a Federal Government of limited powers." *Id.* As provided in the tenth amendment: "The powers

6

not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.  Thus, from the founding of the Union to modern times, it has been well recognized that the States remain sovereign as to all powers not vested in Congress or denied them by the Constitution, *see Gregory* at 457-58, in which the Supreme Court, quoting the Federalist No. 45, has stated:

> The powers delegated by the proposed Constitution to the federal government *are few and defined.  Those which are to remain in the State governments are numerous and indefinite.* . . . The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.

*Id.*  (citation omitted) (emphasis added).

The Supreme Court has repeatedly recognized that this constitutional scheme imposes upon the Federal Government a responsibility not to disrupt the intended balance of power unnecessarily or without willful intent, for good reason.  *See e.g., Gregory* at 461 ("States retain substantial sovereign powers . . . with which Congress does not readily interfere").  The Supreme Court has long adhered to the view that "the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government." *See New York v. United States,* 505 U.S. 144, 162 (1992), *quoting Texas v. White*, 7 Wall. 700, 725 (1869).  The oft-quoted words of Justice Field explain:

> [T]he Constitution of the United States . . . recognizes and preserves the autonomy and independence of the States-independence in their legislative and independence in their judicial departments. [Federal] [s]upervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the State and, to that extent, a denial of its independence.

*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549-50 (1985) *citing Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938) *quoting Baltimore & Ohio R. Co. v. Baugh*, 149 U.S. 368, 401 (1893) (Field, J., dissenting).  Thus, "the composition of the Federal Government was designed in large part to protect the States from overreaching by Congress." *Garcia* at 550-51.  As artfully expressed by the Supreme Court:  "[i]n the tension between federal and state power lies the promise of liberty."  *Gregory* at 459.

**B.     When Construed and Applied in Light of Our Dual-Sovereign, Constitutional Scheme, the Supremacy Clause May Not Abrogate States' Retained Powers Unless Preemptive Effect *Necessarily* Flows from the Federal Statute.**

The upshot of the foregoing discussion is that constitutional safeguards of state sovereignty may not be overlooked in a preemption analysis.  The Supreme Court has stated:

> As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States.  Congress may legislate in areas traditionally regulated by the States.  This is an extraordinary power in a federalist system.  It is a power that we must assume Congress does not exercise lightly.

*Gregory,* at 460.  Because of the gravity of restricting state sovereignty through enactment of preemptive laws, decisions to do so must be made in a deliberate manner, by Congress, through explicit exercise of its lawmaking power to that end.  *See Whiting*, slip op. at 13 ("Absent any textual basis, we are not inclined to limit so markedly the otherwise broad phrasing of the savings clause") (plurality opinion).

Where a federal statute lacks express preemptive language, then for a court to find preemption implicitly, requires an analysis that respects the constitutional scheme by refusing to impute lightly an intent to preempt.  Rather, just as Congress is constitutionally charged with protecting State sovereignty to the greatest extent appropriate, so too should the judiciary approach questions of preemption with strict focus on Congress's intent.  In so doing, preemption may only be implied if there is a plain and unambiguous manifestation of Congress's

8

intent to preempt, as revealed by the ordinary meaning of the statutory text and scheme.  *See Whiting*, slip op. at 14 ("extrinsic aids to construction may be used to solve, but not to create, an ambiguity") (plurality opinion) (quotation and citation omitted).

C.  **The Ordinary Meaning of the Atomic Energy Act Unambiguously Demonstrates that Congress *Did Not* Intend To Preempt States From Regulating Non-Radiological Activities.**

Relying on sweeping pronouncements of the NRC's "exclusive authority over nuclear power plant operation," Entergy contends that Vermont is preempted from imposing any requirement that would effectively prevent the Vermont Yankee Nuclear Station from operating when its current license expires in March 2012.  *See e.g.*, Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Entergy Mem.") 15.  While initially seeming, implicitly, to concede that Vermont's ability to regulate non-radiological safety issues was retained (*see e.g.,* Entergy Mem. 18-19), in its Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Preliminary Injunction ("Reply"), Entergy introduces a new argument that purports even to sweep that away.  *See* Reply 3-4.  Entergy broadly, and incorrectly,[1] argues that FERC has exclusive authority to regulate in non-radiological safety areas such as need and economics.  Reply 3 ("'need' and other economic questions are regulated only by FERC").

These arguments cannot prevail.  As discussed above, only where Congress unambiguously exercises its power under the Supremacy Clause – either expressly or implicitly – should a federal law be given preemptive effect; otherwise the constitutional scheme would be violated, which would be the result if Entergy's arguments prevailed here.  Proper preemption

---

[1] *See Connecticut Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) ("State and municipal authorities retain the right . . . to require retirement of existing generators, to limit new construction to more expensive, environmentally-friendly units, or to take any other action in their role as regulators of generation facilities without direct interference from the Commission").

analysis must consider the ordinary meanings of the federal and state statutes at issue within "the shape of the constitutional scheme," *Garcia* at 550, which is missing from Entergy's approach.

As Vermont's opposition explains, far from express *preemption*, the Atomic Energy Act expressly *saves* and *preserves* a State's right to regulate nuclear facilities with respect to generation, sale, or transmission of electric power; and, further, in the Act, Congress expressly preserves a State's right to regulate nuclear power plants "for purposes other than protection against radiation hazards." *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Vermont Opp.") 5-6. *See generally, Whiting,* slip op. at 15 (holding Arizona's licensing law is not expressly preempted because it "falls well within the confines of the authority Congress chose to leave to the States [in the savings clause]") (plurality opinion).

Thus, there can be neither express preemption – since express language *preserves* states right to regulate – nor field preemption – since Congress expressly did not occupy an entire field but rather reserved substantial areas to States. Therefore, the next consideration of a standard preemption analysis, as applied here, would be whether it is impossible to comply with both Vermont law and the Atomic Energy Act or whether compliance with Vermont law would frustrate or obstruct the purpose of the Atomic Energy Act. *See generally Wyeth* at 1194-1200. However, Entergy does not even attempt to argue that any form of conflict exists, let alone that Congress would have intended preemption in the case of such a conflict. Rather, Entergy rests on a "pretext" argument that challenges the motivation of the Vermont legislature in enacting the state laws at issue to try to remove the law from the confines of the savings clauses. *See e.g.*, Entergy Mem. 3, 20-21 & n.8; Reply 4-12 &n.2. *But see*, Vermont Opp. at 20-24.

The preceding discussion in this memorandum, however, explains that looking to news

articles or quips by current politicians, as Entergy urges (Entergy Mem. 3, 20-21 & n.8) – which does not even evidence the state legislature's intent – cannot possibly speak to congressional intent, which is, at bottom, the essence of an analysis into whether to impute an intent by Congress to exercise its "extraordinary power" to preempt state law. *See Gregory* at 460; *see also Whiting,* slip op. at 13-14 ("extrinsic aids to construction may be used to solve, but not to create, an ambiguity") (quotation and citations omitted) (plurality opinion).  In addition, Entergy's reliance on miscellaneous comments of individuals during state legislative debate (*see e.g.,* Reply 8) is misplaced and similarly fails to evidence state legislative or congressional intent. *See Whiting,* slip op. at 14 (rejecting legislative history where it largely "fail[ed] to discuss the savings clause at all") (plurality opinion).  Moreover, an essential part of the legislative process is open, public debate of the issues, including testimony from individuals with relevant experience.  To the extent individual witnesses offer opinions on whether a certain legislative approach may be unconstitutional under the Supremacy Clause, they are valid testimony of precisely the type that legislators should be considering and not "embarrassing gaffes," as Entergy characterizes them.  Reply 1.  Entergy's approach not only fails to consider the proper constitutional underpinnings of preemption theory, but could chill proper legislative functions by making legislators reluctant to seek advice on the constitutionality of various approaches being considered.

     Rather, a proper judicial inquiry should give preemptive effect to the Atomic Energy Act here only after determining that the structure or language of the Act evidences an intent of Congress to abrogate Vermont's regulatory authority in relation to Vermont Yankee's operation after March 2012.  Mere ambiguity as to Congress's intent is *not* license to imply preemption, even with reference to a purported conflict, which Entergy does not even attempt to demonstrate

11

here. Rather, there must be sufficient indication in the statutory scheme or language that Congress did, in fact, intend to preempt the type of state regulatory action being challenged. *See*, *Wyeth* at 1194-1200. The constitutional limits on the Supremacy Clause cannot be ignored. A finding of preemption must identify some basis to conclude that Congress, indeed, intended the preemptive result with respect to the regulatory actions at issue. Such a determination is critical to do justice to the constitutional scheme in which the Supremacy Clause was intended to operate. *See generally, Gregory* at 464, 470 (refusing to attribute to Congress an intent to intrude on state governmental functions in the face of ambiguity in the statute).

No such determination may reasonably be made here. Neither the language nor scheme of the Atomic Energy Act supports finding a congressional intent to abrogate Vermont's regulatory authority in relation to Vermont Yankee's operation after March 2012. Indeed, it supports the opposite conclusion that Vermont's regulatory authority remains intact.

## Conclusion

For the foregoing reasons, Entergy has failed to establish it is likely to succeed on the merits of its preemption arguments, and for the other reasons set forth in Vermont's opposition, the court should deny Entergy's motion for a preliminary injunction.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorney,

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Kenneth W. Salinger
By:  Carol Iancu, Mass. BBO # 635626
     Environmental Protection Division
     Kenneth W. Salinger, Mass. BBO # 556967
     Federal bar no. 000460889
     Government Bureau
     Assistant Attorneys General
     One Ashburton Place, 18th Fl.
     Boston, Massachusetts 02108
     617.963.2428
     carol.iancu@state.ma.us

Dated: June 13, 2011

*Counsel for Commonwealth of Massachusetts,
Amicus Curiae in Support of Defendants*