UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ENTERGY NUCLEAR VERMONT YANKEE, LLC and ENTERGY NUCLEAR OPERATIONS, INC., : : : : Plaintiffs, : : v. : Docket No. 1:11-cv-99-jgm : PETER SHUMLIN, in his official capacity as : GOVERNOR OF THE STATE OF VERMONT; : WILLIAM SORRELL, in his official capacity as the : ATTORNEY GENERAL OF THE STATE OF : VERMONT; and JAMES VOLZ, JOHN BURKE : and DAVID COEN, in their official capacities as : MEMBERS of THE VERMONT PUBLIC : SERVICE BOARD, : : Defendants. : | |

MEMORANDUM AND ORDER ON PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
(Doc. 4)

Plaintiffs Entergy Nuclear Vermont Yankee, LLC ("ENVY") and Entergy Nuclear Operations, Inc. ("ENOI") seek to preliminarily enjoin Defendants from enforcing Vermont statutes that would require Vermont Yankee Nuclear Power Station ("Vermont Yankee") to cease operations after March 21, 2012. Trial on the merits is scheduled to begin September 12, 2011, eight weeks from the date of this Order. Plaintiffs ENVY and ENOI (collectively "Entergy") own and operate Vermont Yankee, a merchant plant that sells electrical power on the interstate market and is located in Vernon, Vermont. Entergy's Complaint challenges Vermont Acts 74, 160, and 189 as preempted by the Atomic Energy Act, 42 U.S.C. § 2011 et seq. (See Compl. ¶¶ 88-97, 59-76 (Doc. 1), challenging Act 74, 2005 Vt. Acts & Resolves 599; Act 160,

2006 Vt. Acts & Resolves 204; and Act 189, 2008 Vt. Acts & Resolves 478.[1]) Entergy also alleges that under the Federal Power Act, 16 U.S.C. § 791a et seq., the Federal Energy Regulatory Commission's jurisdiction preempts that of the Vermont Public Service Board and General Assembly to determine whether wholesale power is sold from Vermont Yankee, and Vermont is preempted from conditioning approval of continued operation on an agreement to provide Vermonters power at below-market rates. (Compl. ¶¶ 98-108.) Finally, Entergy alleges any threat to condition continued operation on below-market rates for Vermonters burdens interstate commerce in violation of the Commerce Clause and 42 U.S.C. § 1983. (Id. ¶¶ 109-15.)

Act 160 provides that without the Vermont General Assembly's approval, the Public Service Board may not consider Vermont Yankee's petitions for a renewed certificate of public good for continued operation after March 21, 2012 and storage of spent nuclear fuel. See 2006 Vt. Laws 160 § 2 (LexisNexis); Vt. Stat. Ann. tit. 30, § 248(e)(2) (West 2008). The Vermont General Assembly has withheld that approval.[2]

---

[1] Available at www.leg.state.vt.us/Research; 2005 Vt. Laws 74 (LexisNexis); 2006 Vt. Laws 160 (LexisNexis); 2008 Vt. Laws 189 (LexisNexis); or VT-LEGIS-OLD (West).

[2] Defendants argue the Vermont Senate's February 23, 2010, 26-4 vote against reading Senate bill S. 289 for a third time amounts to "no legislative action" on Vermont Yankee's petition. (Prelim. Inj. Hr'g Tr. at 130:3-21, June 24, 2010 (Doc. 83).) The "Legislative Policy and Purpose" section of Act 160 suggests "the general assembly," which comprises two houses, the Senate and the House of Representatives, "shall grant the approval or deny the approval" of a petition for operation and storage of spent nuclear fuel beyond March 21, 2012. 2006 Vt. Laws 160 § 1(f) (LexisNexis). The substantive provision of the enactment speaks only of "approval" and appears to allow inaction by the Senate to prohibit continued operation. Vt. Stat. Ann. tit. 30, § 248(e)(2). The State's position is that Vermont's statutes do not require a final determination of a petition and Acts 74 and 160 themselves amount to a decision to prohibit continued operation. (Hr'g Tr. 132:19-24, 134:22-24, 135:2-13 ("a decision was made in Act 74 and Act 160" although the legislature is "always free to take it up").) Vermont Yankee's petition for a renewed license, filed March 3, 2008, is in a suspended docket before the Public Service Board. Entergy argues that because this legislative inaction, which amounts to a one-house

Vermont Defendants oppose the motion for a preliminary injunction. The Court has considered the June 23 and 24, 2011 hearing testimony and arguments, the parties' pre- and post-hearing submissions, accompanying declarations and exhibits, many of which were submitted as direct testimony and evidence at the hearing, and has reviewed four memoranda submitted by five amici curiae (New England Coalition, Inc.; the Conservation Law Foundation and Vermont Public Interest Research Group; International Brotherhood of Electrical Workers, Local 300; and the Commonwealth of Massachusetts).

The motion is denied, because Entergy has failed to show that any irreparable harm it may incur between now and a decision on the merits would be, or is likely to be, ameliorated by a preliminary injunction in the short time before this Court decides Entergy's claims. Because the Court finds a preliminary injunction is not warranted between now and a decision on the merits in the fall, it need not, and expressly declines to, issue a holding regarding Entergy's likelihood of success on the merits. The Court notes, however, that Entergy has raised serious questions regarding its Atomic Energy Act preemption claim,[3] warranting further briefing and a prompt

---

"pocket veto," is to be given significant executive effect, this Court may consider events in 2010 in determining Entergy's claim that Act 160 is preempted as applied. Id. at 62:9-13, 40:8-11, 68:25-69:2. The arguments on this question may warrant further development at trial. It is also unclear to the Court how a legislative scheme that does not require final determination of a renewal petition for a nuclear plant is compatible with the safe decommissioning of a plant. Cf. 10 C.F.R. § 2.109(c).

[3] The Court is aware the challenged statutes contain words that may or may not permit consideration of preempted grounds for granting or denying certificates of public good, and that the legislative history of the challenged enactments contains numerous references to "safety," some of which may be problematic, some of which may merely reflect legislators' responsible recognition that Vermont cannot regulate radiological health and safety. Act 189 commissioned a study of "reliability," which initiated ongoing oversight at Vermont Yankee that appears to examine numerous aspects of radiological safety affecting reliability. It is not clear if reliability oversight pursuant to that enactment is still ongoing. (See Hinkley Decl. ¶¶ 4, 6 (Doc. 39-30).)

full-dress trial on the merits. The Court must carefully consider this claim and whether the statutes are preempted on their face, as applied, or whether they were enacted for a preempted purpose, as well as whether a permanent injunction is warranted, its precise scope, what State actions, if any, would be enjoined, and, if any injunction is issued, how to tailor relief to remedy alleged harms.

## DISCUSSION

I.      Preliminary Injunction Standard

The decision to either grant or withhold equitable relief "rests in the sound discretion of the court." Petroleum Exploration, Inc. v. Pub. Serv. Comm'n of Ky., 304 U.S. 209, 218 (1938). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 129 S. Ct. 365, 374 (2008). Where a party seeks to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," it cannot, as an alternative to demonstrating likelihood of success on the merits, rely on a showing that there are "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation." Oneida Nation of N.Y. v. Cuomo, — F.3d —, 2011 WL 1745008, at *6 (2d Cir. May 9, 2011).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing the plaintiff is entitled to such relief." Winter, 129 S. Ct. at 376; Sussman v.

---

The Court believes the parties' arguments warrant further development on full evidence offered at a trial on the merits.

Crawford, 488 F.3d 136, 139 (2d Cir. 2007) (describing preliminary injunction as "extraordinary and drastic remedy").  Furthermore, because an injunction is a matter of discretion, even if a plaintiff could show likelihood of success on the merits, preliminary injunctive relief "does not follow from success on the merits as a matter of course."  See Winter, 129 S. Ct. at 381.

A showing that irreparable harm is likely in the absence of preliminary relief is "the single most important prerequisite for the issuance of a preliminary injunction."  Rodriquez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999).  Without it, a preliminary injunction cannot be issued.  The threatened harm must be "actual and imminent," and a movant must show it "cannot be remedied by an award of monetary damages."  Id. at 234.  This Court is mindful that where the Eleventh Amendment bars recovery of monetary damages from a state entity, remedies at law may be inadequate.  United States v. New York, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (dismissing argument plaintiff could have sued in state court, because federal courts may consider only available federal legal remedies).  If the temporary preliminary relief sought will not, or is unlikely to, redress or ameliorate alleged harms, and a full trial and a final decision on the merits can issue before enforcement of challenged laws will take effect, an injunction may not be warranted.  See Nat'l Elevator Cab & Door Corp. v. H & B, Inc., No. 07-CV-1562 (ERK)(RML), 2008 WL 207843, at *6 (E.D.N.Y. Jan. 24, 2008) ("[T]he question is not whether the plaintiff has suffered irreparable harm, but whether it will be irreparably harmed in the absence of an injunction.  In other words, the injunction must prevent or remedy the harm.")  In the unique circumstances presented in this case, only permanent injunctive relief could likely ameliorate the alleged harms, and therefore trial on the merits has been accelerated.  This Court

declines to order short-term drastic and extraordinary injunctive relief that will not offer certainty either in the short or long term, and will have no operative effect on state actions before trial.

The Court will be in a better position to tailor injunctive relief, if it is warranted, as part of a final determination of the merits.  While it is understandable that Entergy wishes relief from the dread of future enforcement of allegedly preempted statutes, where the preliminary injunctive relief -- which would be of very limited duration in this case -- does not operate to enjoin any acts before trial, and cannot redress or ameliorate any harm, it serves only as a preview of the Court's views of the merits and is unwarranted.  Preliminary injunctive relief does not guarantee permanent injunctive relief following trial on the merits.  Even the duration of permanent injunctive relief is uncertain, given the appellate process and the State's ability to amend its laws.  Entergy's claimed harms are only likely to be alleviated by a favorable final decision on the merits.  In recognition that both parties would benefit from a swift and final resolution at the trial level, the trial date has been accelerated.

II.      Irreparable Harm

Entergy argues it will suffer irreparable harm without a preliminary injunction prohibiting the March 21, 2012 closure by operation of pre-empted statutes.  First, without a preliminary injunction, Entergy claims it faces the dilemma of either (a) investing large sums in a refueling and outage, substantial portions of which will be lost if Vermont Yankee shuts down on March 21, 2012, (b) shutting down Vermont Yankee before a decision on the merits to avoid the outlay, or (c) delaying the October outage date and incurring a safety risk.  Second, Entergy claims an injunction is necessary to stem attrition of a skilled workforce.  Third, Entergy argues the threat of closure impairs its ability to enter long-term contracts for the sale of power after

March 21, 2012, and decreases the value of these contracts.  The Court also takes judicial notice that Standard & Poor's, while it affirmed Entergy Corp.'s corporate credit and issue ratings, revised the entity's ratings outlook from "stable" to "negative" on June 28, 2011.  The Court therefore will consider whether the risk of potential damage to Vermont Yankee's ultimate corporate parent's credit amounts to irreparable harm to the subsidiary absent a preliminary injunction.  See Pls.' Suppl. to Prop. Findings of Fact Ex. A, Standard & Poor's, Research Update: Outlook on Entergy Corp. is Revised to Negative Amid Relicensing Uncertainties; Ratings are Affirmed (Doc. 77-1).

      A.      Refueling and Outage

Only a final decision on the merits could actually resolve or even ameliorate the uncertainties and dilemmas Entergy faces in making investment decisions regarding Vermont Yankee's upcoming order for nuclear fuel and a refueling outage.

As noted above, Entergy alleges it will suffer irreparable harm without an injunction given any of the three choices it faces while awaiting a decision: it must either invest large sums in a refueling and outage, substantial portions of which may be lost if Vermont Yankee shuts down March 2012, or shut the plant down before a decision on the merits rather than incur an unrecoverable cost,[4] or it must delay the October 2010 outage date and incur a safety risk.  (Mem. in Supp. of Mot. for Prelim. Inj. at 38 (Doc. 4-1); Pls.' Suppl. to Prop. Findings ¶ 13 (Doc. 77).) This appears to be a business decision made very difficult by the uncertainties of litigation.  A

---

[4] Mr. Herron testified that denial of a preliminary injunction could induce Plaintiffs to consider permanently shutting down Vermont Yankee before the trial on the merits, but "it's a decision that we have not really finalized yet." (Prelim. Inj. Hr'g Tr., Herron Test. 198:7-15, June 23, 2011 (Doc. 82).)

portion of the investment in refueling may be lost if Entergy is ultimately unsuccessful in its suit and Vermont's statutes are validated, but in that situation, the loss is not a cognizable injury. Refueling, however, is not a harm if Entergy prevails on its claims and is able to operate for the useful life of the fuel.  Entergy's choice not to refuel and shut down before a decision on the merits would be irreparable harm if Entergy is ultimately successful in its litigation, but Entergy, while it has raised the possibility, has not persuaded the Court that a decision to shut down is likely and imminent.  Finally, any risk in significantly delaying the October outage is a preventable harm within Plaintiffs' control, and it is not clear that such generalized harm is either likely or imminent.

Vermont Yankee has a mandatory refueling outage scheduled approximately every eighteen months, according to Mr. John T. Herron's declarations and preliminary injunction hearing testimony. (Herron Decl. ¶ 29 (Doc. 4-2); Prelim. Inj. Hr'g Tr., Herron Test. 132:24-133:1, June 23, 2011 (Doc. 82).)  Mr. Herron[5] is president and chief executive officer of nuclear operations and chief nuclear officer of Entergy Corporation.  The next outage is scheduled for October 8, 2011. (Herron Decl. ¶ 34; Herron Test. 140:10-11.)  Herron suggested the outage could be delayed for up to thirty days. (Herron Test. 188:11.)  If an outage is delayed more than thirty days, Mr. Herron testified the fuel core design must be re-analyzed. (Herron Decl. ¶ 34; Herron Test. 189:15-190:6.)  Of the 368 fuel assemblies in the reactor core, one-third of them (between 115-120 assemblies) are replaced during a refueling outage. (Herron Decl. ¶ 29; Herron Test. 135:3-6.)  According to Mr. Herron, this third of the reactor core therefore has a

---

[5] As CEO of nuclear operations and chief nuclear officer, Mr. Herron is responsible for ten nuclear electric facilities in seven states, and management services for a facility in Nebraska.

useful life of between 54 and 72 months, depending on whether the company chooses to replace it after three or four operating cycles. (Herron Test. 134:16-25.) During the refueling, the plant, which has a Nuclear Regulatory Commission ("NRC") resident inspector and senior resident inspector on site, performs NRC-required inspections, testing, and other work that can only be conducted during an outage. (Herron Decl. ¶¶ 30, 37.) Mandatory NRC inspections during the outage cannot, in any case, be delayed beyond mid-February 2012. Id. ¶ 37. Approximately 5,000 tasks take place in a typical 25-day outage. Id. ¶ 31. To complete these tasks, the plant imports approximately 800 to 1,000 supplemental skilled workers from other Entergy nuclear facilities, craft labor unions, and outside contractors. Id. Shifts during the outage go around the clock, seven days a week. Id.

      Mr. Herron also declares the outage cannot be postponed beyond October of this year because it must take place before the cold weather and winter's peak electricity demand levels. (Herron Decl. ¶¶ 34, 36.) The antecedent decision to order the fuel has been postponed from July 7th to July 22nd or 23rd, 2011. (Herron Reply Decl. ¶ 26 (Doc. 46-1).) With just the commitment to purchase the fuel, Entergy will incur fabrication charges of five to ten million dollars. (Herron Decl. ¶ 39; Herron Test. 193:20-24.) The total cost of taking apart the reactor and replacing the fuel elements is approximately $60 to $65 million. (Herron Test. 136:15-17.) The refueling outage itself will cost an additional $35 million. Id. at 194:1-3. Re-fabricating the new fuel assemblies for use at another facility would cost tens of millions, according to Herron. (Herron Decl. ¶ 39.) Once the fuel is placed in the refueling pool before the outage, re-purposing the fuel becomes more costly, and once any fuel is placed in the reactor core, it cannot be re-purposed. Id. ¶¶ 41-42. If the plant refuels and runs at full capacity until mid-March, 2012, it

will earn approximately $90 million in revenue.  (Herron Test. 142:24-143:2.)  Herron made clear that <u>profit</u> figures for the same time period are "not even close" to the $90 million revenue figure.  <u>Id.</u> at 184:1-10.

Herron, both in his declarations and testimony, stated that any decision by Vermont Yankee not to refuel could lead to a decision to permanently shut down, because depletion of the fuel core would decrease output, while operating costs remained largely constant, making continued operation at less-than-full capacity uneconomical.  (Herron Decl. ¶¶ 44-46; Herron Test. 143:12-16; 198:7-12.)  He also testified that an alternative decision to delay the refueling order and the outage, "if not done correctly,"  puts "a safety risk at play" because safety in the nuclear industry relies on "consistency and structure."  (Herron Test. 187:14-25; 187:13.)

However, Herron also acknowledged Entergy has <u>not</u> represented to the Court that Vermont Yankee will not refuel if a preliminary injunction does not issue.  <u>Id.</u> at 141:1-6. A preview of the Court's views would not, as Mr. Herron declared, "remove all uncertainty" and serves chiefly to provide Plaintiffs with "confidence in the plant's future," (Herron Reply Decl. ¶ 21), or give Entergy "some comfort that . . . [Entergy] can at least go and make this investment and keep this plant operating until . . . the final . . . decision." (Herron Test. 199:9-13.)  While a preliminary injunction would give Plaintiffs "some thought that [the case] . . . may have merit," and this would make it "easier" to "make a decision to go ahead and invest" in the refueling and October outage, Herron did not "think it takes care of all the anxiety because we still have this thing open as far as whether we will ultimately prevail." <u>Id.</u> at 196:22-197:9.

In the unique circumstances presented here, the decision to refuel is either not harmful if Entergy prevails on the merits, or it is not a cognizable injury if Vermont's statutes are upheld.

This may present a dilemma, but it does not constitute irreparable harm that can be resolved by a preliminary injunction. While the Court's views would give Entergy a slightly better ability to assess the risks and rewards of refueling given the uncertainties of trial and appellate litigation, this is not an appropriate reason to order the extraordinary remedy of a preliminary injunction. The Court is not persuaded any decision to shut down Vermont Yankee early is imminent. The risks associated with a decision to delay the outage are within Entergy's control. In the situation presented here, where the uncertainty Entergy faces can only be resolved or ameliorated by a decision on the merits, the appropriate course is to accelerate the trial date and issue a timely final decision.

      B.     Attrition

It is not clear that the rise in attrition at Vermont Yankee in 2010 constitutes irreparable harm, or that attrition between now and a decision on the merits will be so significant that a preliminary injunction is warranted. Even if Entergy has carried its burden of showing that a portion of the recent increase in attrition is caused by the impending shutdown, and is enough to constitute irreparable harm, and even accepting that some attrition may occur between now and a decision on the merits because employees' futures are uncertain, there is no evidence a preliminary injunction of limited duration is likely to curtail attrition between now and that decision. See Ass'n of Flight Attendants-CWA, AFL-CIO v. Pension Benefit Guar. Corp. 372 F. Supp. 2d 91, 101 (D.D.C. 2005) (finding threatened attrition of attendants was not irreparable harm where uncertainties of litigation and termination of pension plan would not have been eliminated by an injunction, reasoning that "it is far from clear whether an injunction would have any effect on union members' decisions whether to quit their jobs . . . the uncertainty regarding

11

the [pension] Plan will continue as long as the bankruptcy is ongoing . . . it would be unduly speculative to conclude that an injunction would curtail this attrition.")**.**

Plaintiffs argue the uncertainty surrounding Vermont Yankee's ability to operate past March 21, 2012 is "creating increasingly serious challenges for retaining the highly specialized and skilled personnel needed to operate the plant." (Herron Decl. ¶ 21.)

Plaintiffs argue more employees are likely to leave as the March 2012 date approaches, threatening the plant's operation. (Pls.' Mem. in Supp. of Mot. for Prelim. Inj. at 35 (Doc. 4-1 at 42).) Mr. Herron declared that between October 2010 and April 2011, seven Operations employees and two Operations Instructors in Training resigned. (Herron Reply Decl. ¶ 7.) Of the nine, six identified relicensing uncertainty on exit interview forms as either the primary or secondary reason for leaving.[6] Id. ¶ 9; Herron Decl. Exs. 3, 5, 7, 8, 9, 10. Additional non-Operations employees departing in 2011 also cited relicensing uncertainty as a primary or secondary reason on their forms. (Herron Decl. Exs. 1, 2, 4, 6.)

Operations employees hired as replacements must have a license issued by the NRC that is specific to Vermont Yankee. (Herron Decl. ¶ 19.) An operations license applicant generally must have at least one year of plant experience and have successfully completed a two-year training program. Id. ¶ 20. Herron claims the relicensing uncertainty makes attracting seasoned nuclear employees increasingly difficult. Id. ¶ 22. According to Herron, despite eleven new hires and internal promotions, the Operations and Operations Training areas are still understaffed, and there are five currently unfilled positions in Operations Training. (Herron Reply Decl. ¶¶ 7-8.)

---

[6] The exit interview for one of these Operations employees, however, indicates the employee was told he or she had to find another position within the company or would be let go. (Herron Reply Decl. Ex. 9 ¶ 9.)

Regarding the overall attrition rate at Vermont Yankee, Herron notes that it has gone up as March 2012 approaches. The average attrition rate for employees who left to go work elsewhere from 2008 through 2009 was 6.1 percent. (Herron Decl. ¶ 24.) Following the Senate's February 2010 vote, the attrition rate grew, and for 2010, it was 8.4 percent, approximately a 37 percent increase over the year prior. Id. ¶ 25. The attrition rate for 2011 is on track to exceed that rate. Id.

Defendants have calculated, according to figures cited in a survey published by the Nuclear Energy Institute, that the industry average for non-retirement attrition is two percent per year. (Hinkley Decl. ¶ 14.) The Vermont Yankee non-retirement attrition rate for 2010 that can be compared with that figure is seven percent. (Herron Reply Decl. ¶ 10.)

Defendants do not dispute attrition has risen approximately 37% from 2009 to 2010,[7] and may be similar in 2011. Nor do they dispute Herron's declaration that non-retirement attrition in 2010 was more than three times the industry average. Defendants do dispute the significance and characterization of those statistics, however. Defendants' declarant Bruce E. Hinkley, a nuclear industry consultant, was retained by the state of Vermont to assist in the Act 189 reliability assessment and its continuing oversight over Vermont Yankee. (Hinkley Decl. ¶¶ 1-6 (Doc. 39-30).) Hinkley attended a Management Review Meeting on March 2, 2011, where Michael Romeo, director of Nuclear Safety for Entergy, assured participants that Vermont Yankee "was managing attrition and that the plant was not experiencing unusual attrition," and stated attrition was "not affecting the reliability" of the plant. (Hinkley Suppl. Decl. ¶ 2 (Doc. 68-8).) Hinkley

---

[7] Plaintiffs' Complaint indicates Vermont Yankee employs approximately 650 people. (Doc. 1 ¶ 1), and their Motion for Preliminary Injunction states the station "currently employs over 600 people." (Pls'. Mem. in Supp. of Mot. for Prelim. Inj., at 47 (Doc. 4-1).)

notes, however, that "management talked about the possibility of increased attrition because of the issue of the relicensing." Id.

Defendants point out, and Herron concedes, that Vermont Yankee Station's Operations staffing currently satisfies NRC requirements. (Hinkley Decl. ¶ 13; Herron Reply Decl. ¶ 9.) Hinkley also points out that between February 2011 and April 2011, three employees resigned from Operations and Operations Training areas, and of those, only one mentioned relicensing, listing it as a secondary reason for leaving. (Hinkley Suppl. Decl. ¶ 3; Herron Reply Decl. Ex. 9 (Doc. 46-2); Hinkley Suppl. Decl. Exs. G, H.) For that one employee, the primary reason the employee departed was because he (or she) was told he needed to find another job outside operations within the company or be let go. (Herron Reply Decl. Ex. 9 ¶ 9.)

So, while statistics and exit interviews may show attrition did increase in 2010, it is not clear whether the increase is so great, material, or unusual, as to constitute irreparable harm. It is not clear attrition will be above average, and so dire in the next few weeks, that it would constitute irreparable harm warranting an injunction.

Furthermore, Plaintiffs have presented no evidence, other than conclusory assertions, that persuades the Court a preliminary injunction is likely to stem or curtail attrition in the period before the Court issues a final decision on the merits.

Mr. Herron declared that a preliminary injunction "would provide substantial help in allaying these worker concerns," and "would blunt some of the immediacy of the looming March 21, 2012 deadline and help to tip the balance for those workers who are now torn between staying or leaving." (Herron Decl. ¶ 28.) He also testified, "I think [a preliminary injunction] also would help me with my employees. I don't think it takes care of all the anxiety because we still

have this thing open as far as whether we will ultimately prevail in the final case here." (Herron Test. 197:7-10.) Uncertainty regarding whether the plant will continue beyond March 2012 may be driving potential attrition, but other than conclusory statements that an injunction would instill employees with "confidence in the future" (Herron Reply Decl. ¶ 21), there was no evidence presented at the hearing that a preliminary injunction would relieve or lessen attrition over the next few weeks. Mr. Herron's conclusory statements, speculation, and arguments are not sufficient. See Datapak Assocs., Inc. v. Hoynash, No. 04 Civ. 5731, 2004 WL 2290507, at *2 (S.D.N.Y. Oct. 8, 2004) (noting "[c]onclusory statements are an insufficient foundation on which to find irreparable harm" (citing Baker's Aid v. Hussmann Foodserv. Co., 830 F.2d 13, 16 (2d Cir. 1987))).

Because the Court expects to resolve the request for a permanent injunction expeditiously, and a final decision is more likely to relieve the uncertainty causing alleged employee attrition than preliminary relief, it is more appropriate to proceed to trial. The Court declines to grant the extraordinary relief of a preliminary injunction on this ground.

      C.      Impairment of Long-Term Power Contracts

The Court is not persuaded that a temporary preliminary injunction would ameliorate any harm caused by impairment of Entergy's ability to enter post-March 21, 2012 long-term power contracts, or the inability to enter them without a contingency provision excusing Entergy from performance in the event Vermont Yankee cannot produce power past March 2012.

Mr. Edward D. Kee, a vice president at NERA Economic Consulting who specializes in the economics of the electricity industry, declared on behalf of Plaintiffs that "[n]ear-term harm is caused by current uncertainty about whether the Vermont Yankee Station will be able to operate

after 21 Mar 2012." (Kee Decl. ¶ 11 (Doc. 4-11).)  Entergy concedes this uncertainty "will continue to exist long after trial until all appeals are concluded" but argues this "favors the grant of a preliminary injunction." (Pls.' Reply Mem. at 16 (Doc. 46 at 21).)

Entergy already has in place long-term electricity purchase agreements that are due to expire on March 21, 2012, and it does not argue existing contracts will be jeopardized absent the issuance of a preliminary injunction.  (Kee Decl. ¶ 15.)  Wholesale electricity generators like Vermont Yankee sell electricity into the short-term ISO New England wholesale market, and they enter long-term electricity sale agreements for some portion of their total output in order to manage or hedge electricity market price risk and to ensure predictable revenue levels.  Id. ¶ 18.  Electric utility purchasers also enter long-term contracts to hedge or control price risk.  Id. ¶ 17.  "Entergy Vermont Yankee" can only enter into sale agreements for the post-March 2012 period if those agreements include a contingency that the contracts will only be valid if Vermont Yankee is still operating at that time.  Id. ¶ 19.  Understandably, contracts with such a major contingency are less valuable than contracts without one.  Id. ¶ 20; see also Kee Reply Decl. ¶ 14 (Doc. 46-6) (distinguishing "unit contingencies" for operating plants).  Furthermore, buyers are less likely to contract with Vermont Yankee for the period following March 21, 2012, than they are with other suppliers.  (Kee Decl. ¶ 21; Kee Reply Decl. ¶ 16.)

Even with a favorable final decision on the merits at the district court level, however, contracts entered into by Plaintiffs may still require a contingency provision for power supplied after March 21, 2012, given the uncertainties of appellate litigation.  And the Court has not seen any evidence, and is therefore not persuaded, that issuing a temporary preliminary injunction would facilitate Plaintiffs' ability to enter into fixed-term long-term contracts for power supplied

after March 21, 2012.  This Court declines to order such extraordinary relief before full consideration of the merits, where it appears a temporary injunction will not alleviate or ameliorate any such harm.  Again, the best course is to accelerate the trial on the merits.

      D.      Credit Rating Outlook

This Court takes judicial notice that on June 28, 2011, Standard & Poor's affirmed Entergy Corp.'s corporate credit and issue ratings but revised Entergy Corp.'s credit outlook from "stable" to "negative."  (Pls.' Suppl. to Prop. Findings of Fact Ex. A, Standard & Poor's, Research Update: Outlook on Entergy Corp. Is Revised To Negative Amid Relicensing Uncertainties; Ratings Are Affirmed (Doc. 77-1).)  The Standard & Poor's report cited, among other things, the current uncertainty over Vermont Yankee Station's future, as well as uncertainty for license extensions at other plants, Indian Point Units 2 and 3 in New York, even though New York does not have formal authority over license extensions for the Indian Point plants.  Id. at 2-3.  A rating outlook assesses the potential direction of an issuer's long-term debt rating over the next two years, and it considers possible changes in economic or business conditions.  See http://www2.standardandpoors.com/aboutcreditratings (defining long-term credit ratings and outlooks).  It is not necessarily a precursor of a rating change, although a negative outlook indicates the rating may be lowered.  Id.  When an event or unexpected change is likely to cause a ratings change in the near term, Standard & Poor's places the rating on CreditWatch, replacing the outlook on that rating.  Id.

While Entergy Corp.'s revised outlook in this case cites, among other things, uncertainty surrounding three Entergy plants, not just Vermont Yankee, the prospects of the New York plants is said to hinge in part on Vermont Yankee's success or lack of success in state relicensing.

The Court recognizes courts have held that harm or imminent potential harm to a credit rating and the concomitant inability to raise capital constitutes irreparable harm.  <u>Painewebber Inc. v. Nwogugu</u>, 98-cv-2441 (DLC), 1998 WL 545327, at *2 (S.D.N.Y. Aug. 26, 1998); <u>Hybred Int'l v. Thorne Legal, Inc.</u>, 08-cv-4343 (CPS)(KAM), 2008 WL 5068896, at *5 (E.D.N.Y. Nov. 24, 2008).

The ratings outlook, however, unlike placement on CreditWatch, is not necessarily an indicator of near-term harm.  Even if this Court accepted the revised outlook to be evidence of imminent and likely potential harm to a credit rating, a preliminary injunction could only enjoin acts between now and a final decision, does not guarantee a permanent injunction, and is not likely to remedy the uncertainty giving rise to a revised outlook.  The best course is to proceed to trial in eight weeks with a timely decision to follow.

## CONCLUSION

Therefore, Plaintiffs' Motion for a Preliminary Injunction (Doc. 4) is DENIED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 18th day of July, 2011.

/s/ J. Garvan Murtha
Hon. J. Garvan Murtha
United States District Judge